IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| JONATHAN SMITH,<br><br>Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>Defendant. | CASE NO. 1:26-cv-260<br><br>MAGISTRATE JUDGE JAMES E. GRIMES JR.<br><br>**MEMORANDUM OPINION AND ORDER** |

Plaintiff Jonathan Smith filed a Complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying disability insurance benefits. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The parties consented to my jurisdiction in this case. Doc. 7. Following review, and for the reasons stated below, I affirm the Commissioner's decision.

**Procedural history**

In July 2023, Smith filed an application for disability insurance benefits, alleging a disability onset date of July 15, 2023.[1] Tr. 93, 242. In his application, Smith claimed disability due to high blood pressure, dizziness with frequent falling, uncontrolled hand tremors, history of right foot injury with chronic

[1] "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

pain and weakness, depression, chronic lumbar spine pain, and left above-the-knee amputation with prosthetic. Tr. 285. The Social Security Administration denied Smith's application and his motion for reconsideration. Tr. 87, 93. Smith then requested a hearing before an Administrative Law Judge (ALJ). Tr. 121.

In November 2024, an ALJ held a hearing, during which Smith and a vocational expert testified. Tr. 40–65. In March 2025, the ALJ issued a written decision finding that Smith was not disabled. Tr. 18–35. The ALJ's decision became final on December 3, 2025, when the Social Security Appeals Council declined further review. Tr. 1–3; *see* 20 C.F.R. § 404.981.

Smith filed this action on January 30, 2026. Doc. 1. He asserts the following assignments of error:

> 1. Whether the ALJ reversibly erred by finding that Smith does not use an ambulatory assistive device.
>
> 2. Whether the ALJ failed to build an accurate and logical bridge between the evidence and her RFC finding that Smith can occasionally balance, stoop, kneel, and crouch.

Doc. 8, at 1.

**Evidence**

*Personal and vocational evidence*

Smith was 41 years old on his alleged disability onset date. Tr. 27. He completed the tenth grade and used to work as a chef. Tr. 286.

*Relevant medical evidence*

Smith was involved in a motor vehicle accident in 2014, which resulted in an above-knee amputation of his left leg. Tr. 355. He was subsequently fitted with a prosthetic leg device. Tr. 355.

In June 2023, Smith went to the emergency room for lip swelling due to having taken medication that he was allergic to. Tr. 472. The discharge note indicated that Smith was independent in showering, dressing, and preparing meals, and that he needed assistance with walking. Tr. 478. The note listed his medical equipment as a wheelchair, cane, and rollator, and indicated that Smith "ambulate[d] with a cane." Tr. 478.

In September 2023, Smith had a health assessment at a corrections center and had "no complaints." Tr. 947.

At mental health treatment visits in October and November 2023, the provider commented that Smith had a steady gait. Tr. 983, 989. In November, Smith visited a prosthetics office for an adjustment. Tr. 1226. The adjuster was unable to correct the problem that Smith was having with the knee, so he "put a loaner knee in" until the original was fixed. Tr. 1226.

During a December case management appointment, Smith said that he had gotten a job as a line cook "working 25–30 hours," and that he hoped to get more hours in the summer. Tr. 977.

In December 2023, Smith underwent a health assessment at a corrections center. Tr. 934. He denied experiencing pain; his neurological and

neuromuscular systems were within normal limits; and he was assessed as having a low risk for falls. Tr. 936.

An early January 2024 progress note states that Smith had an "abnormal" gait. Tr. 941. He reported having gotten a new prosthesis one year before the visit and said that he experienced "tenderness" in the stump area for the "past few months." Tr. 938. Later in January, Smith visited the prosthetics office to "swap out his repaired knee." Tr. 1226. The adjuster commented that Smith "walked and was pleased" and said that he was to call again if needed. Tr. 1226.

In March 2024, Smith visited the prosthetics office to obtain a replacement part for his prosthesis. Tr. 1228. Smith said that he "was on his feet all day at work" and sometimes he would lose suction on the prosthetic leg. Tr. 1228. The office ordered ply suction socks for Smith to try. Tr. 1228.

At an April 2024 follow-up mental health appointment, Smith was observed to have a steady gait. Tr. 1028. At a case management appointment later that month, Smith said that he still had his job as a line cook and was "loving it." Tr. 1025.

In June 2024, Smith saw his doctor for a follow-up appointment for carpal tunnel syndrome, hypertension, smoking cessation, and dietary counseling. Tr. 1145. He continued to work as a cook. Tr. 1146. On exam, Smith had an unsteady gait, full strength in all of his extremities, and full, painless ranges of motion. Tr. 1147.

Later that month, Smith visited the prosthetics office to obtain a replacement knee. Tr. 1229. Smith "walked back and forth in the parallel bars to ensure the knee was working properly…" Tr. 1229. He "walked well" and was "happy at this time." Tr. 1229. The adjuster commented that she "added some hook and [V]elcro to his knee to protect it a little more [due to] his kneeling." Tr. 1229.

In August 2024, Smith went to the emergency room after he slipped on water at work and fell down four steps. Tr. 1052. He reported neck and wrist pain. Tr. 1052. Smith denied using an ambulatory assistive device such as a walker, cane, wheelchair, or crutches. Tr. 1054.

*State agency opinions*[2]

In April 2024, Steve McKee, M.D., reviewed Smith's record. Tr. 95–97. Regarding Smith's residual functional capacity,[3] Dr. McKee found that Smith

---

[2] When a claimant applies for disability benefits, the State Agency creates a record. The record includes the claimant's medical evidence. A State Agency disability examiner and a State Agency physician or psychologist review the claimant's record and determine whether and to what extent the claimant's condition affects his or her ability to work. If the State Agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the State Agency updates the record and a second disability examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

[3] A residual functional capacity, or "RFC," is an "'assessment of'" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002) (quoting 20 C.F.R. § 416.945). Essentially, it's the SSA's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

could perform light exertional level work—stand, walk, and sit for six hours in an eight-hour workday, and lift 20 pounds occasionally and 10 pounds frequently. Tr. 100. He could occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; frequently balance; and occasionally stoop, kneel, crouch, and crawl. Tr. 100–01. Smith must avoid all exposure to hazards and he had manipulative limitations. Tr. 101.

*Hearing testimony*

Smith, who was represented by counsel, testified at the telephonic administrative hearing. When asked about his then-recent part-time job at a brewery, Smith said that he was terminated because he couldn't do things that his employer wanted him to do. Tr. 45. He dropped a couple of plates, and he had to take plates over to the servers. Tr. 45. It was a different type of restaurant than Smith worked in before. Tr. 45. He couldn't stand for too long and his employer didn't like him having his cane "on the line." Tr. 45. Smith had worked other jobs as a cook, but he was let go because his carpal tunnel syndrome caused his hands to lock up. Tr. 48–49.

Smith testified that he could lift and carry about 10 to 15 pounds, stand up to an hour at a time, sit for 40 to 60 minutes (depending on how hard the surface was), and walk for about 40 minutes. Tr. 51–52. He said that he uses a walker when he "take[s] a walk." Tr. 52. He has a four-prong cane that he "usually take[s] to work with [him]." Tr. 52. He has a pair of crutches, but he "do[es]n't really use them." Tr. 52. Smith said that to navigate stairs, he needs

to use a railing or someone has to help him. Tr. 53. He said that he can crawl, but then he said that he would have to rest when crawling 20 to 30 feet because he "can't crawl." Tr. 53.

When asked how often he uses his cane, Smith said that he tries not to use it because he's trying to wean himself off having to use it. Tr. 55. But most of the time he uses the cane. Tr. 55. He always has it with him, but sometimes he puts it to the side and tries to do things without it. Tr. 55. "[N]ine times out of ten, [he] need[s] it." Tr. 55. Smith explained that when he worked as a cook, he would have the cane next to him while he prepared meals. Tr. 56. If he felt "wobbly or anything, then the cane [wa]s right next to [him]." Tr. 56. Smith estimated that in a six-hour work shift, he used his cane for about three to four hours. Tr. 57.

The ALJ discussed with the vocational expert Smith's past work as an order cook. Tr. 59–60. The ALJ asked the vocational expert to determine whether a hypothetical individual with the same age, education, and work experience as Smith could perform his past work or any other work if the individual had the limitations assessed in the ALJ's RFC determination, described below. Tr. 60–61. The vocational expert answered that such an individual could not perform Smith's past work but could perform the following jobs: office helper, cleaner housekeep, and merchandise marker. Tr. 61.

**The ALJ's Decision**

The ALJ made the following findings of fact and conclusions of law:

> 1. The claimant meets the insured status requirements of the Social Security Act through June 30, 2028.
>
> 2. The claimant engaged in substantial gainful activity since July 15, 2023, the alleged onset date, but this was an unsuccessful work attempt. Otherwise, the claimant has not engaged in substantial gainful activity since July 15, 2023 (20 CFR 404.1571 *et seq*.).
>
> 3. The claimant has the following severe impairments: left above knee amputation, right femoroacetabular impingement, carpal tunnel syndrome, major depressive disorder, post-traumatic stress disorder, and alcohol use disorder (20 CFR 404.1520(c)).
>
> 4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).
>
> 5. After careful consideration of the entire record, the undersigned finds the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except no left lower extremity foot controls; occasionally climb ramps and stairs using handrails; no climbing of ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; frequently handle, finger, and feel; no operating heavy moving machinery and no unprotected heights; performing simple routine tasks with simple short instructions, making simple decisions; have occasional workplace changes, but no strict production rate or hourly quotas; and occasional interaction with coworkers, supervisors, and the public.

> 6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).
>
> 7. The claimant was … 41 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date (20 CFR 404.1563).
>
> 8. The claimant has at least a high school education (20 CFR 404.1564).
>
> 9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).
>
> 10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569a).
>
> 11. The claimant has not been under a disability, as defined in the Social Security Act, from July 15, 2023, through the date of this decision (20 CFR 404.1520(g)).

Tr. 21–35.

**Standard for Disability**

Eligibility for social security benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous

period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

2. Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.

3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.

4. What is the claimant's residual functional capacity and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.

5. Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920. *see Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 422 (6th Cir. 2008). Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Jordan*, 548 F.3d at 423. The burden shifts to the Commissioner at step five "to prove the availability of jobs in the national economy that the claimant is capable of performing." *Id.* "The

claimant, however, retains the burden of proving her lack of residual functional capacity." *Id*. If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Walters Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

**Standard of review**

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which "a court … asks whether" the "existing administrative record … contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (citations omitted). The substantial evidence standard "is not high." *Id*. at 103. Substantial evidence "is 'more than a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*. (citations omitted). The Commissioner's "findings … as to any fact if supported by substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 587 U.S. at 99.

A court may "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the

Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice within which" the Commissioner can act, without fear of judicial "interference." *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009) (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)).

**Discussion**

*1. The ALJ did not err when evaluating Smith's use of a cane*

Smith challenges the ALJ's determination that a cane was not medically necessary. Doc. 8, at 6–8.

If an assistive device is "not a necessary device for [a] claimant's use, it cannot be considered an exertional limitation that reduce[s] [the claimant's] ability to work." *Carreon v. Massanari*, 51 F. App'x 571, 575 (6th Cir. 2002). To be considered a restriction or limitation, an assistive device "must be so necessary that it would trigger an obligation on the part of the Agency to conclude that the [device] is medically necessary." *Murphy v. Astrue*, No. 2:11-cv-114, 2013 WL 829316, at *10 (M.D. Tenn. March 6, 2013) (citations omitted). To be *medically necessary*, the record must reflect "more than just a subjective desire on the part of the plaintiff as to the use of a[n] [assistive device]." *Id.* (citation omitted). And there must be medical documentation "describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant

information)." Soc. Sec. Ruling 96-9p, 1996 WL 374185, *7 (S.S.A. July 2, 1996); *see Golden v. Berryhill*, No. 1:18-cv-636, 2018 WL 7079506, at *19 (N.D. Ohio Dec. 12, 2018) ("a cane prescription [that] does not indicate 'the circumstances for which [the cane] is needed,' … does not fulfil the requirements under SSR 96-9p"), *report and recommendation adopted*, 2019 WL 415250 (N.D. Ohio Feb. 1, 2019).

"If the ALJ does not find that such device would be medically necessary, then the ALJ is not required to pose a hypothetical to the V[ocational] E[xpert]" which includes the use of an assistive device. *Murphy*, 2013 WL 829316, at *10 (citing *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993)). Generally, an ALJ's finding that an assistive device is not *medically necessary* is error when the claimant was prescribed an assistive device and the ALJ didn't include the use of the device in the RFC without providing an explanation for omitting it. *Cruz-Ridol v. Comm'r of Soc. Sec.*, No. 1:17-cv-1075, 2018 WL 1136119, at *15 (N.D.Ohio Feb. 12, 2018) (citing *Watkins v. Comm'r of Soc. Sec.*, No. 1:16–cv–2643, 2017 WL 6419350, at *11 (N.D. Ohio Nov. 22, 2017)), *report and recommendation adopted*, 2018 WL 1083252 (N.D. Ohio Feb. 28, 2018).

The ALJ evaluated Smith's need for a cane as follows:

> Regarding the claimant's alleged use of a cane and/or walker, the record does not support medical necessity for any assistive device. The claimant testified that he has a walker and a four- point cane. He further testified that he uses the four-point cane "most of the time" (90% of the time) and "always" has

> it with him. However, a review of the medical evidence of record reflects no use of a cane or walker during the relevant timeframe. Regarding his prothesis, the claimant testified that he goes without his prosthesis about four times a year (two weeks to one month each time) because it is broken or being adjusted. The claimant is indeed seen at Leimkuehler Prosthetics and Orthotics about his left above knee prosthetic device, for adjustments and repairs. Although some of the repairs required that part of the claimant's prothesis (e.g., the knee) was returned to the manufacturer for the repair, the claimant was provided with "loaner" parts by Leimkuehler Prosthetics and Orthotics so that he could still use his prothesis while under repair (C13F/6-12). The undersigned finds that the claimant's testimony regarding his prothesis and use of cane/walker is not supported by the medical evidence of record. The undersigned also finds that the claimant's symptoms and limitations are not as severe as alleged.

Tr. 30–31.

Smith complains that the ALJ "did not cite a single treatment note that explicitly states that Smith was not using a cane." Doc. 8, at 7; Doc. 10, at 2. Smith hasn't shown that the default for medical records is that no indication is made when a patient walks with a cane, and that some sort of indication is made when a patient does *not* walk with a cane. The ALJ was permitted to rely on the records that did not indicate that Smith was using a cane.

Smith cites one treatment note from June 2023, about a month before his alleged onset date, that indicates that he used a cane to ambulate. Doc. 8, at 7 (citing Tr. 478). Nevertheless, later records did not indicate that Smith used a cane to ambulate, as the ALJ noted. Tr. 31. Smith concedes that, as the

ALJ observed, treatment notes showed that Smith had a steady gait, but he points out that "more recently in 2024 his gait was noted to be 'abnormal' or 'unsteady.'" Doc. 8, at 7 (citing Tr. 1112, 1147). Transcript page 1112 shows lab results and does not record Smith's exam findings or say anything about his gait. Transcript page 1147 is from an early June 2024 doctor visit, in which Smith's doctor observed that he had an "unsteady gait." Tr. 1147. But this does not mean that the ALJ erred when she found that Smith did not require a cane to ambulate. Indeed, at this visit Smith had full muscle tone and strength, a painless range of motion "of all major muscle groups and joints," and no tenderness. Tr. 1147.

Smith cites his testimony at the administrative hearing, where he stated that he used a walker, a four-point cane, and crutches. Doc. 8, at 7 (citing Tr. 52, 56). But to be medically necessary, the record must reflect "more than just a subjective desire on the part of the plaintiff as to the use of a cane." *Murphy*, 2013 WL 829316, at *10. And the ALJ considered Smith's testimony about using a cane, and did not find it persuasive, Tr. 31—a finding that Smith does not challenge. Finally, Smith cites a 2016 Social Security disability decision in which a different ALJ assessed an RFC in which Smith "must use a cane at all times." Doc. 8, at 7 (citing Tr. 73). But that decision, dated just two years after Smith's leg amputation, is not binding on the ALJ's 2025 decision. *See* Tr. 18–19, 21 (the ALJ explaining that the 2016 decision is not binding on Smith's

2023 application because "the passage of time has made the evidentiary nature of the prior decision less persuasive.").

Smith has not shown that the ALJ erred when she determined that a cane was not medically necessary.

*2. The ALJ's RFC is supported by substantial evidence*

Smith argues that the "ALJ failed to build an accurate and logical bridge between the evidence and her RFC finding that Smith can occasionally balance, stoop, kneel, and crouch." Doc. 8, at 8. "[O]ther than crediting the opinion of state agency reviewer Steve McKee, M.D.," Smith asserts, the ALJ "cited no evidence documenting that [Smith] can perform these postural positions." *Id.* at 9. But Dr. McKee's opinion alone provides substantial evidence for the ALJ's decision. Tr. 32 (the ALJ finding persuasive Dr. McKee's opinion that Smith can perform light work with postural limitations); *see Kurman v. Kijakazi*, No. 1:20-cv-1837, 2022 WL 1067568, at *7 (N.D. Ohio Jan. 13, 2022) ("There is ample case law concluding that State Agency medical consultative opinions may constitute substantial evidence supporting an ALJ's decision") (collecting cases), *report and recommendation adopted*, 2022 WL 765072 (N.D. Ohio Mar. 14, 2022).

In his reply brief, Smith argues that "[f]inding an individual with a prosthetic leg capable of walking and standing while using his hands for six hours per workday is unreasonable." Doc. 10, at 3. This argument amounts to an application of a per se rule that an individual with a prosthetic leg is

incapable of light work. But there is no such per se rule. Indeed, Smith has not cited legal authority for such a rule. The same is true of Smith's argument in his reply brief that the ALJ "failed to explain how an individual with a prosthetic leg can balance, stoop, kneel, and crouch for one-third of the workday." *Id.* at 4. An individual with a prosthetic leg may satisfy a listing at step three and be found to be disabled—indeed, the ALJ at step three considered whether Smith satisfied Listing 1.20 "regarding amputation due to any cause." Tr. 23. The ALJ found that Smith did not satisfy this listing—or any other listing, Tr. 23–24—and so proceeded to determine what Smith could and could not do despite all of his impairments, Tr. 25–33. Smith has not challenged the ALJ's step three determination and has not shown that the ALJ's RFC is unsupported by substantial evidence.

**Conclusion**

For the reasons explained above, I affirm the Commissioner's decision.

So ordered.

Dated: August 28, 2026

*/s/ James E. Grimes Jr.*
James E. Grimes Jr.
U.S. Magistrate Judge